IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

**CITY OF MARY ESTHER, FLORIDA,**

               **Plaintiff,**

       **vs.**

**AGC CHEMICALS AMERICAS, INC.;**
**AMEREX CORP.;**
**ANGUS FIRE;**
**ARCHROMA MANAGEMENT, LLC;**
**ARKEMA INC.;**
**BASF CORP.;**
**BUCKEYE FIRE EQUIPMENT CO.;**
**CARRIER GLOBAL CORP.;**
**CHEMDESIGN PRODUCTS, INC.;**
**CHEMGUARD, INC.;**
**CHEMICALS INC.;**
**CHUBB FIRE, LTD.;**
**CIBA, INC.;**
**CLARIANT CORP., individually and as**
**successor in interest to Sandoz Chemical**
**Corporation;**
**CORTEVA, INC., individually and as**
**successor in interest to DuPont Chemical**
**Solutions Enterprise;**
**DEEPWATER CHEMICALS, INC.;**
**DUPONT DE NEMOURS, INC.,**
**individually and as successor in interest**
**to DuPont Chemical Solutions Enterprise;**
**DYNAX CORP.;**
**DYNEON, LLC;**
**E. I. DUPONT DE NEMOURS AND**
**COMPANY, individually and as**
**successor in interest to DuPont Chemical**
**Solutions Enterprise;**
**KIDDE INC.;**
**KIDDE-FENWAL, INC., individually**
**and as successor in interest to Kidde Fire**
**Fighting, Inc.;**
**KIDDE FIRE FIGHTING, INC.;**
**NATION FORD CHEMICAL CO.;**

**Civil Action No.** __2:23-cv-02640__-RMG

**JURY TRIAL DEMANDED**

1

**NATIONAL FOAM, INC.;**
**RAYTHEON TECHNOLOGIES**
**CORP.;**
**THE ANSUL COMPANY;**
**THE CHEMOURS COMPANY,**
**individually and as successor in interest**
**to DuPont Chemical Solutions Enterprise;**
**THE CHEMOURS COMPANY FC,**
**LLC, individually and as successor in**
**interest to DuPont Chemical;**
**THE 3M COMPANY, f/k/a Minnesota**
**Mining and Manufacturing Co.;**
**TYCO FIRE PRODUCTS, L.P.**
**individually and as successor in interest**
**to The Ansul Company; and**
**UNITED TECHNOLOGIES CORP.**

                      **Defendants.**

## COMPLAINT

Plaintiff, City of Mary Esther, Florida, complains and alleges against each and every Defendant, and their agents, as follows:

### SUMMARY OF THE CASE

1.    Plaintiff brings this action for damages, contribution, and reimbursement costs incurred, and which continue to be incurred, to address the presence of Polyfluoroalkyl substances of "PFAS" chemicals found in the water supply system of Plaintiff. As the manufacturers and sellers of products that contain PFAS compounds, Defendants have discharged PFAS into, or are otherwise responsible for PFAS released into, the waters and environment that serve as the sources used by Plaintiff to provide potable water to its residents.

2.    Specifically, Plaintiff brings this action for the costs required to remediate the presence of Polyfluoroalkyl substances of "PFAS" chemicals—including, but not limited to, Perfluorooctanoic acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorhexanoic acid

("PFHxA"), Perfluoropentanoic acid ("PEPA"), Perfluoroheptanoic acid ("PFHpA"), Pentafluorobenzoic acid ("PFBA"), Perfluorobutanesulfonic acid ("PFBS"), Perfluorononanoic acid ("PFNA"), Perfluorodecacanoic acid ("PFDA"), and Perfluorohexane Sulfonic Acid ("PFHS"), as well as any and all hazardous chemicals produced by Defendants (collectively referred to herein as "PFAS")—found in the raw water sources of the Plaintiff, including distribution systems and wells of Plaintiff located in Okaloosa County, Florida.

3.      For years, Defendants manufactured, sold, and distributed PFAS compounds and products containing PFAS chemicals in the form of a fire-fighting suppressant agent, concentrate solution, or foam known as Aqueous Film Forming Form ("AFFF").

4.      AFFF has been used primarily at civilian and military airports, fire departments, industrial facilities, and military bases for decades for firefighting and training, including Eglin Airforce Base and Hurlburt Field, unaware of the environmental and health risk and hazards of using Defendants' AFFF Products.

5.      PFAS chemicals that seep into the soil and water are dangerous because they are mobile, persist in the environment, bioaccumulate in individual organisms, aquatic life, and humans, and bio magnify up the food chain. Once PFAS chemicals get into the environment, water, soil, aquatic life, mammals, and/or humans, the PFAS chemicals remain forever, hence their common name of "forever chemicals."

6.      PFAS chemicals are associated with significant adverse health effects in humans, including but not limited, to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

7.      Defendants knew, or should have known, that PFAS and related constituents in Defendants' products and by-products present unreasonable risks to human health, water quality,

and the environment and of the dangers associated with these compounds. Yet, Defendants handled, discharged, and were otherwise responsible for the release of PFAS into the environment without sufficient containment, caution, warning, testing, or use of alternative feasible products or components.

8.    Defendants designed, manufactured, marketed, distributed, and/or sold AFFF Products knowing that the PFAS in these products would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by Defendants. Despite their knowledge, Defendants kept this information hidden from the public, including Plaintiff.

9.    Upon information and belief, Eglin Airforce Base and Hurlburt Field, and other flight facilities in Okaloosa County, Florida, routinely used Defendants' AFFF Products in the ordinary course of business.

10.    Defendants' acts and omissions resulted in PFAS seeping into the groundwater and surface water adjacent to the Plaintiff's raw water sources. As a result of the occurrence of PFAS in the environment from Defendants' products, Plaintiff has been and will be required to fund and implement capital costs and has and will in the future incur ongoing operation and maintenance costs.

11.    With regard to the Defendants' tortious and wrongful conduct herein alleged, the Defendants used the U.S. mail, interstate wires, federal and state judicial systems, regulatory filings and testimony, and other vehicles to promote, conceal, protect, and continue their tortious and wrongful conduct over many, many years.

### JURISDICTION, VENUE, AND PARTIES

12.    This Court has subject matter jurisdiction under federal diversity, pursuant to 28

U.S.C. § 1332, as the citizenship of the Plaintiff is completely diverse from the citizenship of the Defendants, and the amount-in-controversy exceeds $75,000.

13.    Plaintiff brings this civil action directly in *In Re: Aqueous Film-Forming Foams Products Liability Litigation*, Multi-District Litigation ("MDL") No. 2873.  Plaintiff files directly in this venue, the United States District Court for the District of South Carolina, Charleston Division, as allowed under the provisions of Paragraphs 25-29 of this Court's Case Management Order No. 3, dated April 26, 2019 (Doc. # 72).  Plaintiff designates the United States District Court for the Northern District of Florida as its "Home Venue" under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in that District.  But for this Court's Order permitting direct filing in this MDL, Plaintiff would have filed in its Home Venue.

14.    Plaintiff owns, maintains, and operates a water collection and distribution utility, principally located at 195 Christobal Road N, Mary Esther, Florida 32569.

15.    Plaintiff was formed around 1986 with the mission of providing its members in Okaloosa County, Florida, with a safe and dependable supply of potable water.

16.    Plaintiff provides potable water to approximately 4,013 residential and commercial customers in the Southern region of Okaloosa County, Florida.

17.    Plaintiff produces potable water from a total of four production wells owned by Plaintiff in southern Okaloosa County, Florida. Additionally, Plaintiff purchases water from Okaloosa County Mid System (Crestview) during emergencies.

18.    Plaintiff's production wells draw water directly from the Floridan and Sand and Gravel aquifers which are recharged predominantly from rainfall.  The Floridian Aquifer alone underlies an area of nearly 100,000 square miles and is a major source of groundwater for more than 11 million residents. Because of their geologic makeup, these aquifers are vulnerable to

contamination, as contamination that occurs at or near ground surface naturally migrates to the aquifers via rainfall.

19.    The EPA's Third Unregulated Contaminant Monitoring Rule ("UCMR3") tested public water systems that serve more than 10,000 people in 2014 for the presence of PFAS. While Plaintiff's wells were not tested, high levels of PFAS contaminants were found in water supplied from production wells in the municipalities neighboring Plaintiff's. PFAS contaminants were found in the production wells of the City of Fort Walton Beach and Okaloosa County Water & Sewer System at levels lower than the minimum reporting requirements at that time but in excess of the current EPA lifetime Health Advisories (HAs) of 0.004 parts per trillion (ppt) for PFOS and 0.02 ppt for PFOA, as more information about their dangerous nature has come to light. Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS, *available* *at:* https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs (last accessed June 27, 2022). The fifth Unregulated Contaminant Monitoring Rule ("UCMR5") called for sample collections for PFAS in accordance with these new Health Advisories between 2023 and 2025. Fifth Unregulated Contaminant Monitoring Rule, *available at*: https://www.epa.gov/dwucmr/fifth-unregulated-contaminant-monitoring-rule (last accessed June 6, 2023).

20.    Plaintiff's well fields are in close proximity to Eglin Airforce Base and Hurlburt Field, which have served for many years as active air force training facilities.  On information and belief, AFFF and/or other PFAS-containing materials have been deployed at Eglin Airforce Base and Hurlburt Field.

21.    The Department of the Air Force published a site inspection report of AFFF release areas on Eglin Air Force Base in March of 2019 that indicated PFOA levels as high as 280,000 ppt

and PFOS levels as high as 535,000 ppt in groundwater samples, all near a fire training area. Site Inspection Report of Aqueous Film Forming Foam Release Areas, Eglin Air Force Base, Florida, *available at*: https://drive.google.com/file/d/1nIp-Rq9m7UwCM_juyR2M4Ud5V3hpJIvL/view (last accessed June 6, 2023.

22.    The Department of the Airforce published a site inspection report of AFFF release areas on Hurlburt Field in June of 2018 that indicated surface soil, subsurface soil, and groundwater from ten areas contained PFAS levels above the EPA's 2016 lifetime Health Advisory level. Groundwater samples were found to contain PFOS concentrations as high as 108,000 ppt and PFOA concentrations as high as 16,000 ppt. Site Inspection Report of Aqueous Film Forming Foam Release Areas Environmental Programs Worldwide, Hurlburt Field, Okaloosa County, Florida, *available at:* https://drive.google.com/file/d/1RpRbbxOzxlXv78sqGx_01pWjuztDGlS-/view (last accessed May 26, 2022).

23.    This action is brought by the Plaintiff to recover damages and seek other redress for harm caused by Defendants' negligence, gross negligence, trespass, nuisance, and fraudulent transfer relating to PFAS. Defendants' actions have caused and continue to cause damages to Plaintiff.

24.    The term "Defendants" refers to all Defendants named herein jointly and severally.

    i.    <u>The DuPont Defendants</u>

25.    Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with principal offices at 974 Centre Road, Wilmington, DE 19805. DuPont does business throughout the United States, including in Florida. DuPont manufactured, marketed, promoted, distributed, and/or sold products or compounds containing PFOA and/or PFOS or which degraded into PFOA and/or PFOS, that were used in AFFF. Specifically, DuPont was a founding

member of the Fire Fighting Foam Coalition and through its active participation in this Coalition, DuPont marketed and sold its fluorosurfactants containing PFAS to AFFF manufacturers, and DuPont suppressed, concealed, and diluted the truth, information, and data that it knew about the dangers of PFAS and its products over a very long time, all to the detriment of the Plaintiff.

26.     Defendants The Chemours Company and The Chemours Company FC, LLC are Delaware corporations with principal offices at 1007 Market Street, Wilmington, DE 19899. These Defendants are collectively referred to as "Chemours" or "the Chemours Defendants" and do business throughout the United States, including in Florida. In 2015, DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. The fluoroproducts and chemical solutions businesses appear to have been transferred to both The Chemours Company and the Chemours Company FC, LLC. The Chemours Company was incorporated as a subsidiary of DuPont until approximately April of 2015, and The Chemours Company FC, LLC was formed as a subsidiary around the same time. In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company. As part of this spinoff, Chemours assumed certain environmental liabilities associated with DuPont's historical business lines, including those related to PFOA/PFOS. DuPont and Chemours, as alleged in detail below, fraudulently conveyed the assets and liabilities of DuPont in this spinoff. Chemours has filed a complaint against DuPont in the Delaware Chancery Court seeking declaratory relief related to the allocation of various environmental liabilities. DuPont's creation of Chemours was for the purpose, in part or whole, of shielding DuPont and/or Chemours of certain liabilities and claims related to PFAS.

27.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with principal

offices at 974 Centre Road, Wilmington, DE 19805. Corteva does business throughout the United States, including in Florida. Corteva was formed through a series of transactions initiated by the merger of DuPont and the Dow Chemical Company ("Dow") in August of 2017, which formed DowDuPont, Inc. ("DowDuPont"). DuPont and Dow each became subsidiaries of DowDuPont. Corteva was formed as a subsidiary of DowDuPont in 2018, and in approximately June 2019, DowDuPont spun off its agricultural business to Corteva. Corteva is the parent of DuPont, holds all of DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to PFAS manufacture, marketing, distribution, and/or sale. Corteva's creation is for the purpose, in part or whole, of attempting to avoid PFAS liabilities and claims.

28.    Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont) ("New DuPont") is a Delaware corporation with principal offices at 1007 Market Street, Wilmington, DE 19898. New DuPont does business in the United States, including in Florida. DowDuPont became New DuPont following the Corteva spinoff. New DuPont holds assets in the specialty products businesses, and the remainder of the financial assets and liabilities that DuPont held after the aforementioned spinoffs. Presumably, these assets and liabilities are valued at billions of dollars and are related to DuPont's historic PFAS manufacture, marketing, distribution, and/or sale. The creation of the New DuPont is for the purpose, in part or whole, of attempting to avoid PFAS claims and liabilities.

29.    Defendants DuPont, New DuPont, the Chemours Defendants, and Corteva are collectively referred to herein as the "DuPont Defendants." The DuPont Defendants manufactured PFAS-containing compounds for manufacture and use in AFFF products for sale and use throughout the United States, including Okaloosa County, Florida.

ii.    The Manufacturer Defendants

30.     Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation, with its principal place of business located at 3M Center, 220-9E-02, St. Paul, Minnesota 55144.

31.     Beginning before 1970 and through at least 2002, 3M manufactured PFOS for use in AFFF and other products, and it manufactured AFFF that contained PFAS compounds for sale and use throughout the United States, including Florida.

32.     Defendant Dyneon, LLC ("Dyneon") is a subsidiary of 3M and is a Delaware corporation with principal offices at 100 S 5th Street #1075, Minneapolis, MN 55402. Dyneon does business throughout the United States, including in Florida, and in various other countries. At all relevant times, Dyneon manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at various chemical plants, fire-fighting locations, military facilities, manufacturing locations, landfills, and other locations throughout the United States, including the Okaloosa County, Florida, area.

33.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe. Upon information and belief, beginning in 2011, Amerex designed, manufactured, marketed, distributed, and sold AFFF containing PFAS.

34.     Defendant The Ansul Company (hereinafter "Ansul") is a Wisconsin corporation, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

35.     At all times relevant, Ansul manufactured fire suppression products, including

AFFF that contained PFAS compounds, including a fire-fighting foam product named TARGET-7. Ansul initially used fluorosurfactants from Ciba-Geigy (Lodyne S-112) for Ansul's fluoro-telomerization process to manufacture AFFF. Ansul's foam was known as Ansulite of AnsulAFFF. Ansulite 3x3 was marketed as the first alcohol-resistant AFFF capable of being used on both hydrocarbon and polar solvent fuels at a 3% concentration. Additional suppliers of fluorosurfactants to Tyco/Ansul include Dynax, Chemguard, and Atochem. Tyco/Ansul's AFFF does not contain perfluorooctane sulfonate ("PFOS") due to their telomerization process but did contain perfluorooctanoic acid ("PFOA"). Ansul's AFFF products were first sold to the U.S. Government in 1976.

36.    The Ansul Company, founded in 1912, started conducting fire-fighting training programs in 1940 at Ansul's headquarters in Marinette, Wisconsin. Ansul changed its name over the years: from 1915 to 1963 it was Ansul Chemical Company, then from 1963 to 1981, the Ansul Company, and from 1981 to 1995, Ansul Fire Protection. In 1978, Ansul was acquired by Wormald International, an Australian company in the fire protection business since 1889. Tyco International, Ltd. ("Tyco") purchased Wormald International in 1990. While Tyco sold much of Wormald to Evergreen Capital, LLC in 2015, Tyco retained Ansul. Ansul now exists as a brand of Tyco Fire Products, L.P. (*infra*), marketed as a premium brand line of products.

37.    Tyco and Ansul's headquarters in Marinette, Wisconsin, has been ranked among the dirtiest and worst facilities in the United States for cancer risk due to air and water releases. Ansul polluted the nearby Menominee River in Marinette, Wisconsin, with heavy contamination of arsenic compounds released from 1957 to 1977. For many years, Tyco operated under orders with the Wisconsin Department of Natural Resources (Consent Order 2A-73-714) and the EPA.

38.    Chemguard, Inc. ("Chemguard") is a foreign corporation, having a principal place

of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco International acquired Chemguard in 2011. Chemguard moved its corporate headquarters to Marinette, Wisconsin, moving in with Ansul, following Tyco's acquisition.

39.    The Chemguard name continues to be used as a brand name by Tyco Fire Products, L.P. Chemguard explained the realignment as follows: "When Tyco acquired the Chemguard brand in 2011, we planned to make use of the joint best practices, industry knowledge, and production synergies that come with integrating two businesses." From the press release announcing the Chemguard acquisition, Tyco declared: "We're excited about the Chemguard acquisition, which broadens our global portfolio of fire-fighting foam products and services . . . Chemguard's expertise in fire-fighting foam chemistry and applications will enhance our R&D efforts and enable us to speed our time to market with innovative products and services."

40.    At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained PFAS compounds. Chemguard makes both 3% and 6% fluorotelomer-based AFFF. Chemguard's AFFF was first sold to the U.S. Government in 1998. Chemguard also manufactured and sold its own fluorosurfactants to other AFFF manufacturers, including Defendant National Foam, Inc). Chemguard purchased other fluorosurfactants from Ciba-Geigy (Lodyne), Dynax, Chemours (Capstone), and Atochem n/k/a Archema.

41.    Defendant United Technologies Corporation ("United Technologies") is a Delaware corporation authorized to do business in New York, with principal offices at 10 Farm Springs Road, Farmington, CT 06032.

42.    Defendant Raytheon Technologies Corp. ("Raytheon") is a Delaware corporation, with principal offices at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Upon information and belief, Raytheon is successor-in-interest to United Technologies.

43.     Tyco Fire Products, L.P. ("Tyco Fire") is a limited partnership with its principal place of business at 451 North Cannon Avenue, Lansdale, PA 19446. Founded in 1960, Tyco was formed as an investment and holding company, focused primarily on governmental research and military experiments in the private sector. In the 1980s, Tyco reorganized along broad categories of business segments, one of them being Tyco Fire. In July 1997, Tyco merged by reverse takeover with the smaller, publicly-traded company, ADT Limited. Tyco International Ltd. of Massachusetts became a wholly-owned subsidiary of ADT Limited, and simultaneously ADT changed its name to Tyco International Ltd., retaining the Tyco stock symbol, TYC, on the NYSE. The merger moved Tyco's incorporation to Bermuda. In 2002, Tyco formed its wholly-owned subsidiary, SimplexGrinnell LP, the World's largest fire protection company. Tyco later sold off a number of its units, including its Capital division, and then in 2007 split into three separate companies: Covidien, TE Connectivity, and Tyco International Ltd. f/k/a Tyco Fire & Security and Tyco Engineered Products & Services. In 2012, Tyco again split into three separate companies: Tyco Fire, ADT, and Flow Control (acquired by Pentair which was later acquired by Emerson Electric). At some point, Tyco became Tyco International PLC, an Ireland company, with its subsidiary Tyco International (US) Inc. and operational headquarters in Princeton, New Jersey. Tyco merged into Johnson in 2016, with Johnson being the renamed parent company and assuming Tyco's PLC structure in Ireland. Tyco's CEO, George R. Oliver, who had previously been the CEO of Tyco Fire, became the CEO of the merged entity.

44.     Ansul, Chemguard, and Tyco Fire manufactured AFFF-containing PFAS or PFAS by-products for sale and use throughout the United States, including the Okaloosa County, Florida, area.

45.     National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb

National Foam are collectively referred to as "National Foam") is a Pennsylvania corporation, with its principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

46.    At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including in Okaloosa County, Florida.

47.    Defendant Angus Fire ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom.  Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, North Carolina 27501. At all times relevant, Angus manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including Okaloosa County, Florida.

48.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including Florida.

49.    Defendant Kidde Inc. ("Kidde") is a Delaware corporation authorized to do business in New York, with principal offices at One Carrier Place, Farmington, CT 06034. Upon information and belief, Kidde, was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

50.    Defendant Kidde Fire Fighting, Inc. ("Kidde Fire Fighting") is a Pennsylvania corporation with principal offices at 400 Main Street, Ashland, MA 01721. Upon information and belief, Kidde Fire Fighting was formerly known as National Foam, Inc., National Foam System, Inc., and/or Chubb National Foam, Inc.

51.    Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business in Ashland, Massachusetts. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Florida. Kidde manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances for sale and use throughout the United States, including Florida.

52.    Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation, with principal offices at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418. Upon information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business.  Upon information and belief, Carrier is the parent corporation of Kidde-Fenwal.

53.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

54.    Defendant Ciba, Inc. (f/k/a Ciba Specialty Chemicals Corporation) ("Ciba") is a Delaware corporation, with principal offices at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

55.    Defendant BASF Corporation ("BASF") is a Delaware Corporation, with principal offices at 100 Park Avenue, Florham Park, NJ 07932.  Upon information and belief, BASF is the successor-in-interest to Ciba.

56.    Defendant Dynax Corp. ("Dynax") is a Delaware corporation, with principal offices at 103 Fairview Park Drive, Elmsford, NY 10523.

57.    Defendant Clariant Corp. ("Clariant") is a New York corporation, with principal offices at 4000 Monroe Road, Charlotte, NC 28205.

58.    Defendant Archroma Management, LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with principal offices at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

59.    Defendant Arkema Inc. ("Arkema") is a foreign corporation, with principal offices at 900 First Avenue, King of Prussia, PA, 19406.

60.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation, with principal offices at 2 Stanton Street, Marinette, WI 54143.

61.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation, with principal offices at 55 E Uwchlan Ave, Suite 201, Exton, PA 19341.

62.    Defendant Chemicals Inc. is a Texas corporation, with principal offices at 12321 Hatcherville Road, Baytown, TX 77521.

63.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation, with principal offices at 196122 E County Road 40, Woodward, OK 73801.

64.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a South Carolina corporation, with principal offices at 2300 Banks Street, Fort Mill, SC 29715.

65.    Upon information and belief, Defendants Chemicals, Inc., Deepwater, and Nation Ford designed, manufactured, marketed, distributed, and sold fluorosurfactant products containing PFAS for use in the manufacture of AFFF products.

66.    Collectively, Defendants 3M, Dyneon, Amerex, Ansul, Tyco, Buckeye,

Chemguard, United Technologies, Raytheon, Kidde, Kidde Fire Fighting, Kidde-Fenwal, Angus Fire, National Foam, Carrier, Chubb, DuPont, Ciba, BASF, Dynax Clariant, Archroma, Arkema, ChemDesign, AGC,-Chemicals, Inc., Deepwater, and Nation Ford are referred to in this Complaint as the "Manufacturer Defendants."

<u>**FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION**</u>

**a. Polyfluoroalkyl Substances and Their Risk to Public Health**

67.     PFAS are chemical compounds containing fluorine and carbon that are not naturally occurring and must be manufactured.

68.     PFAS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

69.     PFAS are mobile because they easily dissolve in water and spread in the environment, where they can readily contaminate soils and leach from the soil into groundwater and travel significant distances.

70.     PFAS are characterized by the presence of multiple carbon-fluorine bonds that make them thermally, chemically, and biologically stable; they resist degradation due to light, water, and biological processes.

71.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

72.     PFAS bioaccumulate and biomagnify in numerous ways. First, they are relatively

stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFAS will be added to any PFAS already present. In humans, PFAS remain in the body for years. PFAS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFAS.

73.    PFAS are persistent when released into the environment because their chemical structure makes them resistant to breakdown or environmental degradation.

74.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

75.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

**b.    Defendants' Manufacture and Sale of AFFF and Component Products**

76.    In the 1940s and 1950s, 3M began creating PFAS chemicals and compounds and incorporating them into certain of their products. 3M not only used PFAS chemicals in its own products but also sold them to other companies for use in AFFF.

77.    AFFF is Class-B firefighting foam first developed to extinguish hydrocarbon fuel-based fires and have since been used in wire insulation, cleaners, textiles, leather, paper, and paints.

78.    PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid, and are thus effective for products which require fire resistance, and oil, stain, grease, and water repellency.

79.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

80.    The AFFF coats the fire, blocking the supply of oxygen and creating a barrier to

extinguish the vapors. A film also forms to smother the fire after the foam has dissipated.

81. It is this film formation feature that provides fire extinguishment and is the source of the designation, aqueous film forming foam or AFFF.

82. Thousands of gallons of foam solution may be applied during a single release or discharge of AFFF.

83. If it is not contained, the AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, sewers, surface water, and/or groundwater.

84. AFFFs contain PFAS in their concentrate and formulation and/or has known or foreseeable by-products when the AFFFs are released into the environment.

85. In or around 1966, AFFF containing PFAS was patented as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and fire-fighting training facilities.

86. Since then, Manufacturer Defendants have designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing PFAS or the chemical precursors that degrade into PFAS.

87. The PFCs needed to manufacture those fluorosurfactants contained PFAS and/or their chemical precursors, and were designed, manufactured, marketed, distributed, and/or sold by the Manufacturer Defendants.

88. Upon information and belief, the Manufacurer Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in AFFF products designed, manufactured, marketed, distributed, and/or sold by other Manufacturer Defendants.

89. Upon information and belief, the Manufacturer Defendants designed,

manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the AFFF products discharged into the environment at military bases around the country, including Eglin Airforce Base and Hurlburt Field, during fire protection, training, and response activities, resulting in widespread PFAS contamination.

90.     Upon information and belief, the Manufacturer Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment at military bases around the country, including Eglin Airforce Base and Hurlburt Field, during fire protection, training, and response activities, resulting in widespread PFAS contamination.

91.     The EPA acknowledges that the studies associated with PFAS compounds are ongoing, and as such, the HAs may be adjusted based upon new information.  In EPA's February 2020 "PFAS Action Plan: Program Update", the agency included information on a newly approved laboratory method—Drinking Water Method 533—for testing and detecting PFAS in drinking water.  This new method will allow for more effective measurement of PFAS in drinking water. EPA also announced that it plans to provide for further monitoring of PFAS in the next UCMR sampling cycle.

92.     Additionally, in March 2023, in a significant step to tighten the federal health-based standards, the EPA announced it was gathering the information on PFOA, PFOS, and other PFAS substances necessary to begin the process of establishing legally enforceable levels as part of the national primary drinking water regulation for PFOA and PFOS.

c.     **AFFF and Component Product Manufacturers' Awareness of Danger of PFAS**

93.     As manufacturers, sellers, handlers and dischargers of PFAS compounds, and products containing PFAS, Defendants knew or should have known that the inclusion of PFAS

chemicals in any products presented an unreasonable risk to human health and the environment, yet they failed to warn the public or provide reasonable instruction on how to manage wastes generated from those products.

94.     Upon information and belief, since the 1960s AFFF meeting MIL-F-24385 specifications were developed in coordination with the DOD to extinguish fires at military bases, airports, oil refineries, and fire-fighting training facilities throughout the United States by a number of manufacturers and/or their subsidiaries, including 3M, Tyco, Buckeye, Chemguard, United Technologies, Kidde, Kidde Fire Fighting, Angus Fire, National Foam, and Chubb. Defendant 3M was the only manufacturer of PFOS.

95.     Upon information and belief, Chubb, through its association with National Foam, obtained patents under the name Chubb National Foam, Inc. for AFFF and similar fire-fighting foams, and manufactured AFFF for the DOD under the name Chubb National Foam, Inc.

96.     Upon information and belief, Defendants 3M, Tyco (and its predecessor Ansul), Buckeye, Chemguard, National Foam, Kidde, Carrier, Angus Fire, and Chubb (through its association with National Foam) all developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS.

97.     Upon information and belief, Defendants DuPont, Ciba, BASF, Dynax, Clariant, Chemours, Chemours FC, Archroma, Arkema, ChemDesign, and AGC all designed, manufactured, marketed, distributed, and sold fluorosurfactant products for use as component products in the manufacture of AFFF.

98.     Upon information and belief, Defendants Chemicals Inc., Deepwater, and Nation Ford all designed, manufactured, marketed, distributed, and sold products containing PFAS and/or their chemical precursors for use in the manufacture of AFFF and AFFF component products.

99.     Upon information and belief, the Manufacturer Defendant knew of the risks of PFAS to the environment and health.

100.     Indeed, Defendant 3M knew of the potential threats posed by AFFF by at least 1970.

101.     In the November 1970 issue of Fire Journal, the National Fire Protection Association (NFPA) published a letter by S.I. Kalkstein, the President of Chemical Concentrates Corporation titled "Toxicity of 'Light Water' to Fish,", which advised that tests of 3M's AFFF product demonstrated that it was so "highly deleterious to marine life . . . [that] the entire test program had to be abandoned to avoid severe local stream pollution."   Letters to the Association, Fire Journal, Nov. 1970, at 87.

102.     Indeed, a 1970 3M study revealed a lethal dose of PFAS in fish at 1ppm, the lowest concentration tested.  At this concentration, the fish were unable to swim upright and died within weeks of being exposed to PFAS.  The fish that received a dose of PFAS at 4ppm died within days; at 12.5 ppm the fish died within hours; and at 125 ppm the fish died within minutes.

103.     In response to Kalkstein's letter, Hugh G. Bryce,  the Technical Director of 3M's Chemical Division, wrote that 3M conducted  tests to evaluate the safety of its AFFF products and that "tak[ing] into account the remote possibility that significant quantities of the fire-extinguishing agent would enter a body of water, as well as the fact that relatively high levels can be tolerated, it appears from a practical point of view that the use of 'Light Water' brand agents could not have any significant adverse effect on fish or other marine life in either fresh or salt water."  *Id.*

104.     As members of the NFPA and leading manufacturers in the industry, the Manufacturer Defendants knew or should have known of the potential harmful effects of AFFF as

Kalkstein advised in his letter.

105.    In 1975, 3M, the sole manufacturer of PFOS, learned that PFOS was present in the blood of the general population.  In 1976, 3M confirmed that PFAS was bioaccumulating in the blood of its employees.

106.    In 1978, 3M conducted a study of PFAS toxicity in Rhesus monkeys in which every monkey involved in the study died.

107.    3M repeated the Rhesus monkey experiment at a low dose of 4.5 ppm of PFAS, and still, every monkey involved in the study died.

108.    Upon information and belief, Defendant 3M continued to produce PFAS until 2002, and sold AFFF containing PFOS until 2003.

109.    The Manufacturer Defendants had a duty, which they breached, to notify the EPA when they had information that reasonably supported the conclusion that a substance or mixture presented a substantial risk of injury to health or the environment. See Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

110.    At all times relevant to this Complaint, no containment measures were listed in Safety Data Sheets ("SDS" (f/k/a/ Material Safety Data Sheets ("MSDS")), nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, and product packaging for AFFF.

111.    MSDS for certain AFFF products directed users to collect AFFF prior to discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

112.    At all times relevant to this Complaint, the MSDS and SDS instructions, warning labels, and product packaging did not fully describe or adequately warn users of all of the health

and environmental risks of AFFF, which Defendants knew or should have known existed, or of all of the precautions they should have taken, which Defendants knew or should have known existed and were necessary.

113.    Upon information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles.

114.    Upon information and belief, AFFF containing other PFAS compounds with six carbon atoms ("Short Chain PFAS"), rather than 8 carbon atoms ("Long Chain PFAS") (like PFOS and PFOA) continue to be developed, manufactured, and sold by the Manufacturer Defendants.

115.    Defendants knew or should have known at the time they put their AFFF products into use and into the environment that PFAS compounds are highly soluble in water, highly mobile, toxic, extremely persistent, bio-accumulative, and highly likely to contaminate water supplies if released to the environment.

116.    Defendants' actual and/or constructive knowledge of the adverse impacts from PFAS compounds to human health and the environment amounts to reckless disregard to human health and environmental safety. Nonetheless, Defendants negligently and recklessly manufactured and sold PFAS and products containing PFAS with no warnings or instructions on use or disposal to avoid contamination.

117.    Motivated by billions of dollars in profits, the DuPont Defendants and 3M have intentionally withheld, suppressed, minimalized, diminished, marginalized, misrepresented, and obfuscated factual information in their possession regarding the toxic effects of PFASs on the environment, animal health, aquatic life, and human health.

118.    Defendants, or some of them, applied for and received various patents regarding their AFFF products over many years, including alternative feasible products such as fluorine-free

foam concentrates.

119.    Defendants' actions have directly resulted in contamination of Plaintiff's water supply. Because Defendants' PFAS have infiltrated the waters that serve as the sources for Plaintiff's public water supply systems, this contamination is recurring and continuing.

## ILLEGAL TRANSFERS BETWEEN THE DUPONT DEFENDANTS

120.    In approximately 2014, DuPont formed Chemours as its subsidiary company. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

121.    In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business included fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemours Company FC, LLC (again, collectively "Chemours").

122.    In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities assumed by Chemours are not publicly available.[1]

123.    The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont

---

[1] For instance, various of The Chemours Company's and DuPont's public filings indicate that both The Chemours Company and the Chemours Company FC, LLC were transferred assets that include fluoroproducts and chemical solutions business lines.

knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

124.    At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

125.    At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

126.    Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. This indemnification remains uncapped. Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

127.    Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

128.    At the time of the DuPont-Chemours spinoff in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

129.    After the spinoff, new members of the Chemours board were appointed. The spinoff and related decisions were conducted while DuPont controlled the board. The new Chemours board did not take part in the separation.

130.    DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds. Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

131.    Relatedly, in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia relating to its Washington Works facility in Parkersburg, West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFAS pollution of the environment, including drinking water supplies.

132.    In 2016, Chemours acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

133.    Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

134.    At the time of the DuPont-Chemours spinoff, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other

performance chemicals, such as benzene.

135.    The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spinoff with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liabilities, including for the claims that arise out of this case, which has and will further harm Plaintiff.

136.    DuPont has continued its plan to avoid PFAS liabilities more recently, and in similar methods to the Chemours maneuvers, by creating Corteva, Dow-DuPont, and the New DuPont.

## PFAS TESTING

137.    On May 2, 2012, the EPA published its UCMR3, requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFAS. *Revisions to the Unregulated Contaminant Monitoring Regulation (UMCR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

138.    While Plaintiff's wells were not included in UCRM3 because of its population, several PFAS contaminants were found in water supplied from production wells in the municipalities neighboring Plaintiff's. PFAS contaminants were found in the production wells of the City of Fort Walton Beach and Okaloosa County Water & Sewer System at levels lower than the minimum reporting requirements at that time but in excess of the current EPA lifetime Health Advisories of 0.004 ppt for PFOS and 0.02 ppt for PFOA. Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS, *available at:*

https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs (last accessed June 27, 2022).

139.    In 2022, the EPA released updated health advisory (HA) levels for PFAS, specifically PFOA and PFOS. Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS, *available at:* https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs (last accessed June 27, 2022). The EPA HAs identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.004 ppt (PFOA) and 0.02 ppt (PFOS). *Id.* The HAs are based on peer-reviewed studies of the effects of PFAS on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFAS. These studies indicate that exposure to PFAS over these levels may result in adverse health effect including:

a.    Developmental effects to fetuses during pregnancy or to breast-fed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b.    Cancer (testicular and kidney);

c.    Liver effects (tissue damage);

d.    Immune effects (e.g., antibody production and immunity);

e.    Thyroid disease and other effects (e.g., cholesterol changes)

## COUNT I– NEGLIGENCE

140.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

141.    This cause of action is brought pursuant to Florida law.

142.    Defendants failed to employ reasonable care which a reasonably prudent person should use under the circumstances by transporting, manufacturing, using, utilizing, storing,

handling, and/or disposing of toxic substances, specifically PFAS, in a way permitting its release into the soil, groundwater, and surface water and resulting in contamination of the Plaintiff's raw water sources.

143.    The contamination of the water was a foreseeable consequence of Defendants' actions.

144.    Defendants owed Plaintiff a cognizable duty to exercise reasonable care in transporting, testing, manufacturing, using, utilizing, storing, handling, environmental release, and/or disposing of toxic substances, specifically PFAS.

145.    Upon learning of the release of toxic substances, including but not limited to PFAS, Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it reached and contaminated Plaintiff's water supply, as well as warn buyers, consumers, and residents of the toxicity of the PFAS.

146.    Defendants breached that duty by failing to act reasonably in the transporting, testing, manufacturing, using, utilizing, storing, handling, and/or disposing of toxic substances, specifically PFAS, and failing to warn anyone of the toxicity and dangers.

147.    Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, or remedy a release of PFAS after it occurred, as well as failing to warn anyone of the toxicity and dangers of PFAS.

148.    Defendants negligently breached their duties to Plaintiff to ensure that their transporting, testing, manufacturing, using, utilizing, storing, handling, and/or disposing of PFAS was carried out in a safe and sufficiently secure manner as to prevent the release of PFAS into the environment surrounding their facilities.

149.    Defendants' breach of their duties was the direct, sole, and/or proximate cause of

Plaintiff's damages as alleged herein and imminent, substantial, and impending harm to Plaintiff.

150.    Defendants' negligence was grossly negligent, willful, wanton, and/or in reckless disregard of the Plaintiff's rights, such that punitive damages should be awarded.

151.    Plaintiff seeks compensatory damages and punitive damages in a sum determined by a jury, as well as costs and damages for remediation and abatement of the PFAS chemicals.

## COUNT II – STRICT LIABILITY

152.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

153.    This cause of action is brought pursuant to the laws of Florida.

154.    Defendants' manufacturing, use, operational, and disposal practices as it related to material and AFFF/Component Products contaminated with PFAS and/or other ultrahazardous toxins was negligent, reckless, and/or intentional and constituted an ultrahazardous or abnormally dangerous activity for which Defendants are strictly liable.

155.    The Defendants' manufacture, use, mishandling, and disposal of material and products that contained PFAS was inappropriate, given PFAS's toxicity and danger to human health and the proximity of the Plaintiff's sources of raw water.

156.    As a result, Defendants allowed or caused these ultrahazardous and abnormally dangerous substances to leach into the water supply relied on by Plaintiff.

157.    Further, Defendants' contamination of the water supply with PFAS created the likelihood for personal injury and property damage to individuals who use and rely upon the water.

158.    Defendants' manufacture, use, mishandling, and disposal of PFAS and their reckless disregard for the consequences of their actions caused the existence of a high degree of harm to both the Plaintiff and its property. Given the nature of PFAS, the likelihood of harm was

great.

159.    The risk of such activities outweighs any value associated with the same.

160.    Defendants are strictly liable in tort for personal injury and property damage sustained by the Plaintiff.

161.    Accordingly, Plaintiff seeks general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate the Plaintiff for those injuries and losses and to restore Plaintiff to its original position, as well as costs and damages for remediation and abatement of the PFAS chemicals.

## COUNT III – STRICT LIABILITY (FAILURE TO WARN)

162.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

163.    This cause of action is brought pursuant to the laws of Florida.

164.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals, products, and by-products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's water supply system, thereby causing damage to Plaintiff.

165.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds, chemicals, products, and by-products would have on the environment and the activities and rights of the Plaintiff and others.

166.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, the bioaccumulation of PFAS in humans, animals, and aquatic life, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

167.     Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants to be used without adequate safety measures poses a substantial likelihood of resulting in PFAS contamination in the areas in which they were used, proximately resulting in the PFAS contamination.

168.     Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants did in fact result in PFAS contamination in the areas in which they were used, proximately resulting in the PFAS contamination.

169.     The Manufacturer Defendants knew or should have known that the use of their AFFF products in the exact manner in which they were designed to be used, would result in PFAS contamination in the areas in which they were used, proximately resulting in the PFAS contamination.

170.     Knowing of the dangerous and hazardous properties of their products, the Manufacturer Defendants had a duty to warn of the hazards associated with their products contaminating the environment, including drinking water.

171.     The Manufacturer Defendants' AFFF products containing PFAS should not have been manufactured in the particular design they were, but having been manufactured, adequate instructions and warnings should have been provided with the products.

172.     Defendants failed to provide warnings or instructions sufficient to notify the users and/or the public and/or the Plaintiff of the dangers inherent in Defendants' products and by-products.

173.     Defendants' failure to provide proper and adequate notice or instruction regarding the dangers of their products and by-products to human health and the environment rendered Defendants' PFAS-containing products and PFAS by-products unreasonably dangerous for the

purposes intended and promoted by Defendants.

174.    Defendants' duty to warn is and was a non-delegable duty.

175.    The DuPont Defendants and 3M also intentionally, recklessly, and without regard for human life and the environment covered up, suppressed, withheld, obfuscated, minimized, and otherwise misrepresented the facts they had with regard to the PFAS chemicals, compounds, products, and by-products as such relate to the persistence and high mobility of PFAS in the environment, the bio-accumulation of PFAS in humans, animals, and aquatic life, and the environmental fate and transport. The DuPont Defendants and 3M not only failed to warn the public and the Plaintiff of same, but, at various times, failed to warn certain manufacturers and sellers of AFFF including some of the Defendants in this civil action.

176.    This failure to warn or adequately instruct regarding the dangers associated with use of Defendants' products directly and proximately caused harm and damages to Plaintiff.

177.    Had the Manufacturer Defendants provided adequate warnings, measures could have been taken to avoid or decrease exposure to PFAS.

178.    Had the Manufacturer Defendants provided adequate warnings, the users of AFFF in the areas surrounding Plaintiff's water supply sources could have taken steps to reduce or prevent the release of PFAS into the environment.

179.    Adequate warnings should have included, but are not limited to:

    a.    a warning not to allow the AFFF to enter soils, sediment, groundwater, or waterways;

    b.    a warning to immediately collect AFFF upon use; and

    c.    a warning that, because the Manufacturer Defendants' AFFF contained constituents such as PFAS, which pose risks to human health and the environment, use of AFFF containing PFAS requires immediate containment, remediation and removal after use.

180.    The Manufacturer Defendants' failure to provide adequate and sufficient warnings for the AFFF products they manufactured, marketed, and sold rendered the AFFF a defective product.

181.    Because, or to the extent, the AFFF products were used exactly as designed, the harm resulting from their use was reasonably foreseeable, and thus proximately caused by the Manufacturer Defendants' actions or inaction.

182.    As a direct and proximate result of the Manufacturer Defendants' defective design of the AFFF products, the water supply of the Plaintiff and surrounding soil, groundwater and surface water is contaminated by PFAS, proximately resulting in damages to Plaintiff.

183.    The failure to warn and deceptive conduct of the DuPont Defendants and 3M, as to the public, the Plaintiff, and certain manufacturers and sellers of AFFF, including some of the Defendants in this civil action, constitutes reprehensible, outrageous, and fraudulent conduct, justifying an award of punitive damages as against the DuPont Defendants and/or 3M for failure to warn.

## COUNT IV – STRICT LIABILITY (DESIGN DEFECT)

184.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

185.    This cause of action is brought pursuant to the laws of Florida.

186.    Defendants' manufacturing, use, operational, and disposal practices as it related to material and AFFF/Component Products contaminated with PFAS and/or other toxins led to products that were in a defective condition, which were unreasonably dangerous to buyers, end users, and properties.

187.    Defendants herein, at all times relevant, were in the business of the design,

manufacture, sale, and distribution of PFAS-containing products, chemicals, and compounds, and/or the foregoing use of which created PFAS in the environment as part of the foreseeable use of AFFF products.

188.    When Defendants placed their PFAS-containing AFFF products into the stream of commerce, the products were defective, unreasonably dangerous, and not fit, suitable, or safe for the intended, foreseeable, and ordinary uses.

189.    The products designed, manufactured, sold, and distributed by Defendants reached consumers and users without substantial change to the condition and nature of the products. The Defendants made their AFFF products pursuant to their own formulas, research, design specifications, and testing.

190.    Defendants, with knowledge of the risks associated with the use of PFAS compounds, failed to use reasonable care in the design of PFASs.

191.    The defects in Defendants' products existed at the time the product left Defendants' control and were known to Defendants.

192.    Reasonable safer alternatives exist and were available to Defendants at all relevant times.  In fact, many of the Defendants patented feasible alternative products. Thus, the risks of Defendants' products outweighed the benefits.

193.    The defects in Defendants' products proximately caused and have directly resulted in the damages of which Plaintiff complains.

194.    Plaintiff seeks compensatory damages and punitive damages in a sum determined by a jury, as well as costs and damages for remediation and abatement of the PFAS chemicals.

## COUNT V – TRESPASS

195.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding

paragraphs as if fully restated herein.

196.    This cause of action is brought pursuant to the laws of Florida.

197.    Defendants, their agents, and their employees knew, or should have known, that their PFAS chemicals are extremely hazardous to raw water and other rights of the Plaintiff.

198.    Defendants so negligently, recklessly, and/or intentionally failed to properly control, apply, use, and/or dispose of PFAS contaminants, such that they proximately caused and continue to cause said contaminants to contaminate Plaintiff's groundwater and resources.

199.    The contamination has varied over time and has not yet ceased. PFAS continue to migrate into and enter into Plaintiff's raw water supply. The contamination is reasonably abatable.

200.    Plaintiff has not consented to, and does not consent to, this contamination.

201.    Defendants knew, or should have known, that the Plaintiff would not consent to this trespass onto the land and water it has rights to under its longstanding treaty.

202.    At the time the above-described, affirmative, voluntary, and intentional acts were performed with the willful intent to cause PFAS be disbursed onto lands and into the lakes.

203.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused a large quantity of PFAS to be released into the water and aquatic life for the Plaintiff.

204.    Defendants' willful, wanton, and intentional failure to act and/or their affirmative choices of actions and following courses of actions have caused PFAS to enter and trespass upon the land the Plaintiff has rights to and cause injury to those rights.

205.    Additionally, and/or alternatively, Defendants' decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the PFAS exposure and contamination after having knowledge and notice of said contamination were done with actual

malice, and in wanton, willful, and/or reckless disregard for the rights, health, and property of the Plaintiff.

206.     Accordingly, the Plaintiff seeks general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate it for the injuries and losses and to restore Plaintiff to its original position, including but not limited to the repair and restoration of the property and such has not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential and nominal damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial, as well as costs and damages for remediation and abatement of the PFAS chemicals.

## COUNT VI – FRAUDULENT CONVEYANCE AGAINST THE DUPONT DEFENDANTS

207.     Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

208.     Plaintiff seeks all relief available under the Florida Uniform Fraudulent Transfer Act for the Dupont Defendants' violations of the Florida UFTA, Fla. Stat. § 726.101 *et seq.* for their fraudulent conveyances as part of their various spin-off transactions.

209.     The DuPont Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or collect a judgment which they are or will be owed. As a result of the DuPont Defendants' acts, omissions, and other conduct described herein, Plaintiff has been damaged.

210.     At all relevant times, the DuPont Defendants have (1) acted with actual intent to hinder, delay, and defraud parties; (2) acted without receiving a reasonably equivalent value in exchange for the transfer obligation arising out of the DuPont-Chemours spinoff; and/or (3) were

engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business or that the business intended to incur, or those liabilities the DuPont Defendants believed or reasonably should have believed that Chemours would incur.

211.    For decades, DuPont manufactured, marketed, distributed, and/or sold PFAS chemicals or compounds for use in AFFF and/or that the DuPont Defendants knew would create PFAS by-products when AFFF was used for its intended purpose, with the DuPont Defendants having superior knowledge that they were toxic, mobile, persistent, bio-accumulative, and biomagnifying, and through normal and foreseeable use, would impact Plaintiff's water sources.

212.    As a result of the transfer of assets and liabilities described herein, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution, and/or sale of compounds or chemicals for use in AFFF products.

213.    At the time of the transfer of its performance chemical business to Chemours, DuPont had been sued, had notice of suits, and/or had knowledge of likely litigation regarding DuPont's liability from the manufacture, marketing, distribution, and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

214.    The DuPont Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay when those debts became due.

215.    The claims, judgment, and potential judgments against Chemours potentially exceed its ability to pay. Accordingly, Plaintiff seeks a voidance of the transfer of DuPont's

liabilities for the claims brought herein and seeks to hold the DuPont Defendants liable for any damages or other remedies that may be awarded by the Court or jury arising from this Complaint. Plaintiff further seeks all other rights and remedies that may be available to it, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## COUNT VII – PRIVATE NUISANCE

216.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

217.    This cause of action is brought pursuant to Florida law.

218.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has physically invaded Plaintiff's real property, including the use thereof, and unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its property, including access to or use of the groundwater and surface waters.

219.    The private nuisance created by Defendants is continuing.

220.    Defendants have failed, and continue to fail, to abate the private nuisance.

221.    By causing and creating the nuisance of PFAS contamination and the resulting impact to Plaintiff's property, groundwater, and surface water, Defendants are liable to Plaintiff.

222.    As a result of the private nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment, and removal of PFAS contaminants that have and will continue to migrate from Plaintiff's soil into its ground and surface waters.

## COUNT VIII – PUBLIC NUISANCE

223.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

224.    This cause of action is brought pursuant to the laws of Florida.

225.    Through Defendants' acts and omissions, Defendants' AFFF and PFAS-containing AFFF products and their by-products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to a clean environment, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

226.    The public nuisance created by Defendants is continuing.

227.    Defendants have failed, and continue to fail, to abate the public nuisance.

228.    The DuPont Defendants and 3M, in other places in the United States, have paid hundreds of millions of dollars to settle civil lawsuits in attempts to remedy environmental damage to public property and waters  and the persons directly affected adversely from using such property and waters. Despite this, the Plaintiff expects that the DuPont Defendants and 3M in this civil action will deny that they engaged in these very same wrongful activities and conduct in Okaloosa County, Florida. The DuPont Defendants and 3M have made such baseless denials in other lawsuits filed by other water providers to date.

229.    By causing and creating the nuisance of PFAS contamination and the resulting impact to Plaintiff's property, groundwater, and surface water, Defendants are liable to Plaintiff.

230.    As a result of the public nuisance, Plaintiff has suffered and continues to suffer significant harm and damages special to Plaintiff and different in kind from those the general public may have suffered, including investigation, cleanup, remediation, and removal costs and

damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's property and water supplies, such that Defendants should be required by injunction to abate the nuisances they have created.

## PUNITIVE DAMAGES

231.    Plaintiff hereby repeats, realleges, and reiterates each allegation in the preceding paragraphs as if fully restated herein.

232.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and/or reckless conduct that caused the foregoing injuries, property damage, nuisances, and trespasses upon the persons and properties of Plaintiff, disregarding its protected rights.

233.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measure to ensure PFAS containing materials would be effectively disposed of and not discharged into the surrounding environment and groundwater supplies.

234.    Defendants have caused great harm to the property and natural resources of the Plaintiff and demonstrated an outrageous conscious disregard for the Plaintiff with implied malice, warranting the imposition of punitive damages.

235.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the Plaintiff. Therefore, Plaintiff requests an award of punitive damages in an amount enough to punish the Defendants and that fairly reflects the aggravating circumstances alleged herein.

236.    Defendants are strictly, jointly, and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other reliefs set forth below.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, City of Mary Esther, Florida,

Water Department, as to each and every count herein, demands judgment against Defendants, and

each of them, individually, jointly, and severally, and request the following relief:

a.   A jury trial and finding or declaration that Defendants engaged in tortious conduct, including negligence, strict liability, trespass, nuisance, fraudulent transfer, and/or willful, wanton, and careless disregard for the Plaintiff;

b.   An award to Plaintiff for all economic and non-economic damages, including general, compensatory, consequential, and incidental damages;

c.   An order for an award of attorney fees and costs, as provided by law;

d.   An award of pre-judgment and post-judgment interest as provided by law;

e.   Equitable or injunctive relief;

f.   Compensatory damages according to proof including, but not limited to:

   i.   Costs associated with the remediation or abatement of PFAS chemicals in sources of raw water;

   ii.   Costs associated with treating raw water contaminated with PFAS;

   iii.   Costs associated with any soil remediation of PFAS;

   iv.   Diminution of property value caused by PFAS contamination;

g.   An order barring transfer of DuPont's liabilities for the claims brought in this Complaint.

h.   An award of punitive damages in an amount sufficient to punish Defendants and to deter Defendants from engaging in similar wrongful conduct in the future; and

i.   An order for all such other relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues in the matter.


Dated, this the 13th day of June 2023,

Respectfully submitted,

**PLAINTIFFS**


*/s/T. Roe Frazer II*
T. Roe Frazer II
Frazer PLC
30 Burton Hills Blvd, Ste 450
Nashville, TN 37215
T: (615) 647-6464
roe@frazer.law